IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| BOISE TOWER ASSOCIATES, LLC, a Washington Limited Liability Company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| WASHINGTON CAPITAL JOINT MASTER TRUST, a Washington trust; WASHINGTON CAPITAL MANAGEMENT, INC., a Washington corporation; PACIFIC NORTHWEST REGIONAL COUNCIL OF CARPENTERS, LOCAL 635; PACIFIC NORTHWEST REGIONAL COUNCIL OF CARPENTERS; and M.A. MORTENSON COMPANY, a Minnesota corporation, | ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. CV 03-141-S-MHW  **MEMORANDUM DECISION and ORDER** |
| Defendants. | ) ) | |
| WASHINGTON CAPITAL JOINT MASTER TRUST and WASHINGTON CAPITAL MANAGEMENT, INC., | ) ) ) ) | |
| Defendants/Counterclaimants, | ) ) | |
| v. | ) ) | |
| BOISE TOWER ASSOCIATES, LLC, | ) ) | |
| Plaintiff/Counterdefendant. | ) ) | |

**Memorandum Decision and Order  - Page 1**

Currently pending before the Court for its consideration are the following motions:

1) Plaintiff Boise Tower Associates, LLC's motion to amend complaint to add a claim for punitive damages (docket # 173), filed October 3, 2005; and 2) Plaintiff Boise Tower Associates LLC's motion for partial summary judgment (docket # 184), filed December 13, 2005. Following oral argument on these motions on March 14, 2006, additional motions were filed relating to the request to amend to add a claim for punitive damages. The Pacific Northwest Regional Council of Carpenters/Pacific Northwest Regional Council of Carpenters Local 635 filed a Motion for leave to file a supplemental brief in opposition to the motion to amend to add a claim for punitive damages (docket # 230). Boise Tower Associates, LLC responded to this motion, which led to the filing of a second motion by the Pacific Northwest Regional Council of Carpenters, to strike pages 8-13 of the response brief (docket # 241). The grounds for the motion to strike was that Boise Towers Associates, LLC had used the opportunity in their response brief to reargue the legality of the contract rather than just responding to the discrete matters raised in the motion for leave to file a supplemental brief, in contravention of this Court's Order that no additional submissions on the legality of the contract would be allowed except by leave of Court.

The Court has considered all of the submissions and matters raised during oral argument. The motion to add a claim for punitive damages to the First Amended Complaint will be denied (docket # 173). The motion for partial summary judgment as to contract interpretation will be granted (docket # 184). As to the post-hearing motions, the motion for leave to file a supplemental brief in opposition to the motion to amend will be denied (docket # 230). This motion is denied on the grounds that the Court has already been presented with voluminous

material in connection with these motions and there is a point where briefing has to end. Accordingly, the motion to strike pages 8-13 of the response brief is rendered moot (docket # 241). With that said, the Court notes that the additional arguments presented in that brief were in contravention of the Court's earlier Order that leave of Court would have to be granted before additional briefing could be submitted. Counsel are admonished to comply with the Court's directives in the future.

## I.
## Introduction.

Before addressing the motions, the Court is confronted with a choice of law issue as to whether Washington or Idaho law governs particular causes of action. This is an issue which overlays both of the motions that are to be addressed. As will be discussed in more detail later, when a dispute arises about choice of law, the primary focus is on which state has the "most significant contacts" with the particulars claims at issue, whether it be for breach of a contract, an alleged tort committed by a party, or whether punitive damages should be a component of the case. This analysis involves the consideration of a number of factors and policies. The determination of which state has the most significant relationship to the disputes between these parties requires an in depth discussion of the history of the failed Boise Towers office and condominium building ("Project"), including a discussion of the key parties, the state where the negotiations relationships were centered and other policies and factors relating to choice of law.

## II.
## Background.

The Plaintiff BTA is a Washington limited liability company. There are two members of this LLC, F. Fredrick Peterson ("Rick Peterson" or "Peterson") and Eastman Associates, LLC,

which is another Washington limited liability company. Peterson is reported to be the sole member of Eastman Associates. BTA's purpose was to be the owner and developer of a 25-story mixed-use condominium building to be built in downtown Boise, known as Boise Towers.

In May, 1997, BTA entered into a Disposition and Development Agreement ("DDA") with Capital City Development Corporation ("CCDC"). The DDA contained the terms and conditions under which BTA would be allowed to purchase and develop the property. On or about August 4, 1999, BTA selected M. A. Mortenson Company ("Mortenson") to be the general contractor.

Mortenson is headquartered in Minneapolis, Minnesota and is represented to be one of the nation's largest contractors. Mortenson has had considerable experience negotiating union agreements throughout the United States. According to Paul Campbell, Senior Vice-President of Administration for Mortenson, in other parts of the country, Mortenson performs as a "union contractor" in that it is a signatory to collective bargaining agreements and has signed union labor agreements with all of the basic trades. It currently has in effect 50 to 75 union labor agreements, including project labor agreements, and "9(a)" and "8(f)" agreements. It also has approximately 20 different union labor agreements with the Carpenters Union. About 50% of Mortenson's directly hired workforce is union, 75%-80% of the projects it works on involve union labor, and about 35%-40% of all of its the projects are 100% union. However, in Idaho, Mortenson had not been a signatory to a union collective bargaining agreement.

Mortenson had previously done major construction work in the Boise area for Micron Technology, Inc. This Boise Towers project was to be managed out of Mortenson's Bellevue, Washington office by one of its construction executives, John Nowoj.

Under the terms of the DDA, the CCDC had to give prior approval for any financing of the project by BTA.  Efforts to find a lender were not successful until approximately three years later when BTA notified the CCDC in April, 2001, that they had a loan commitment from Fremont Investment and Loan.  However, Fremont would not finance the entire loan, but needed a participant.  In April, 2001, a Fremont representative contacted Russ Cree ("Cree"), a loan broker who was employed by a loan brokerage firm located in Bellevue, Washington.  In the past, Cree had placed loans on behalf of Washington Capital Management, Inc. ("Washington Capital") and the Fremont representative wanted to find out if  Washington Capital  would be interested in participating as a lender on the BTA project.

The individual Cree contacted was E. L. Jahncke ("Jahncke"), Washington Capital's President and fund manager, whose offices are located in Seattle, Washington.  Washington Capital is an investment manager of various retirement assets owned by its clients.  These clients include joint labor-management pension fund trusts.  One of these trusts was the Washington Capital Joint Master Trust whose assets included retirement funds of union members and other contributing workers throughout the western United States.  Jahncke indicated that Washington Capital would be interested in participating in the loan with Fremont.

Cree was then introduced to Rick Peterson as a broker who may be able to assist in the financing of the project.  Thereafter, Cree and BTA entered into a written agreement where Cree agreed to assist BTA in obtaining financing for the project in return for a brokerage fee.  According to Cree, discussions were held in late April through May, 2001, with Fremont, Peterson, Washington Capital's representative Richard Hardan (who was actually the President of Compass Group, Inc., a division of Washington Capital with offices in Spokane, Washington)

about conditions that would have to be met if Washington Capital were to participate in the loan and, of critical importance to the issues raised in this case, that all work would have to be performed by union members.

These discussions culminated in a letter from Cree dated June 7, 2001, from his Bellevue Office to Rick Peterson at BTA's office in Boise, Idaho.  The letter first indicated that Washington Capital and Compass would consider participating in the loan.  The letter further set forth:

> WCM and Compass are pension fund advisors.  Their primary constituents are Taft Hartley (trade union) pension fund accounts and as such, when considering real estate equity and/or debt investments, they require first and foremost that a project be constructed with union labor.
>
> Based on significant and substantial due diligence that Fremont has shared with WCM (Mr. E. L. Jahncke) and Compass (Mr. Rich Hardin), Fremont's proposed financing terms as well as the several meetings and conference calls with you, John Nowoj of Mortenson Construction and Rob Meister of Fremont, <u>if the union requirement can be satisfied</u>, WCM and Compass are willing to proceed toward formal approval of a participation with Fremont in the amount of $15 million.

(Emphasis in original.)

Earlier, Peterson had asked Mortenson to completely rebid the project with a union labor requirement, which everyone recognized would increase the cost of the project.  By May 25, 2005, Mortenson was in the process of putting together a union scope of work identifying subcontractors who could utilize union labor.  Exhibit 271 to the deposition of Chuck Rauch, Mortenson's on site construction manager in Boise, contains a listing of subcontractors by phase and those that had union affiliation.  On this list, three phases of the work were designated as

being done by Mortenson's own work force, such as rough carpentry, and no union affiliations were noted.[1]

Another potential lender appeared briefly on the scene in June, 2001, and, after some jockeying around, eventually both Fremont and the other lender withdrew, leaving Washington Capital as the only lender.  In the summer of 2001, negotiations appeared to be occurring by letter, telephone, fax, and email between the various parties offices in the state of Washington and Idaho.  On June 19, 2001, a meeting was held in Boise which was attended by Cree, Hardan, three representatives from Mortenson, Jahncke, Peterson, and numerous trade union representatives.  According to Cree, the purpose of the meeting was to have everyone meet to discuss how the structure could be built with union labor at a "workable" price.  In late June, Cree and Jahncke made another trip to Boise.  Discussions also occurred while Peterson was at his Bellevue location and construction draw requests were faxed to him at that location on different occasions in July.  On July 11, Cree and Jahncke made another trip to Boise.

On August 29, 2001, a meeting was held at Mortenson's Boise office, which was opened by Chuck Rauch.  Harden from Compass Group gave an overview and history of the project.  John Nowoj from Mortenson's Bellevue, Washington office gave a history of the bidding, objectives, and parameters of construction.  Also discussed at the meeting with the union representatives were such matters as job conditions, wage concessions, shifts, union status, overtime, shift differential, parking, flex start, etc.

---

[1]    On July 9, 2001, Mortenson provided Peterson with an estimate of additional cost that would be involved in doing the "core and shell" with union as opposed to non-union labor.  This did not include the additional cost for having union workers do the "finish out."  The additional cost or "premium" was $2,177,152.

**Memorandum Decision and Order  - Page 7**

In June and July, 2001, Washington Capital provided BTA with various drafts of its Mortgage Income Fund Loan applications, each of which contained a provision requiring union labor participation on the project.  On September 7, 2001, Peterson sent to Washington Capital's office in Seattle a signed loan application with a refundable deposit.  On September 26, Washington Capital faxed to Peterson at his Boise and Bellevue offices a $29 million loan commitment.  A meeting was held, according to Cree's notes, on October 5 at Peterson's Bellevue office between Jahncke, Cree, and Peterson.  The purpose was to discuss budget, prepaid equity, deferred equity, etc.  On October 8, 2001, Peterson accepted the September 26 loan commitment, subject to seven clarifications that Peterson wanted to have included.  On October 9, Jahncke responded that the "clarifications" were not acceptable, the commitment was terminated, and the deposit was refunded.  On October 10, Peterson agreed to sign the loan commitment and repaid a deposit of $150,000.

BTA has named both the Pacific Northwest Regional Council of Carpenters, with its principal place of business in Kent, Washington, and the Pacific Northwest Regional Council of Carpenters Local 635, with its offices in Idaho, as defendants ("Union Defendants" or "Union").  Some of the other unions that would have been involved in the project were the Laborers and Cement Masons.  The Pacific Northwest Regional Council of Carpenters took the lead as far as making sure that the project would be built entirely with union labor.  One of their lead organizers was  Lance Fritze who all worked out the Spokane, Washington office.  On August 31, 2001, Fritze sent a letter to Mortenson's Boise project manager, Rauch, which included a copy of the Southern Idaho Master Agreement.  This agreement applied to all building construction for the lower half of Idaho and any contractor who signed it thereby agreed to use

all union labor on all construction jobs in the region.  Fritze's letter also informed Mortenson that one of Mortenson's largest subcontractors for the project, Newway Forming, was not a union employer and would not commit to signing a union agreement.  The letter advised Mortenson that Newway Forming would not be acceptable to the union.  A list of acceptable union subcontractors was attached to the letter, and the letter closed, "This agreement will have to be for all the work Mortenson has in Southern Idaho."

Mortenson did not want to sign the Southern Idaho Master Agreement, which they viewed as a "9(a)" agreement because it would require them to use union employees on all of the future jobs in Southern Idaho.  Another type of labor agreement, called an "8(f)" agreement, expires upon the completion of a building project and the general contractor has no further obligation to continue with union labor.

As mentioned earlier, BTA had selected Mortenson as it contractor in 1999.  However, there was never a fully signed construction contract between the parties while BTA sought financing. Mortenson billed, and BTA paid for, its services under a letter of intent to award the contract and authorization to proceed with the work.  After signing the loan commitment, BTA inserted a new paragraph into the Mortenson construction contract regarding the union participation requirement, under the heading, "Compliance with Lender's Union Requirements" (¶ 14.8).   After this provision was inserted, Peterson signed the agreement and forwarded it to John Nowoj's Bellevue office on October 26, 2001.  The inserted provision provided:

> Contractor represents that it is a party to a bona fide AFL-CIO
> building trades labor union agreement or agreements covering any
> work to be performed by the Contractor's directly hired work
> force, including agreements with the Carpenters, Cement Masons,
> and Laborers local.  Contractor shall award all subcontracts to

> firms which are party to the appropriate AFL-CIO building trades
> union labor union agreements.  . . .

Mortenson signed this agreement, however, it is undisputed that Mortenson had not in fact

entered into any union labor agreement for the Project at that time.[2]

For a period of time Mortenson was considering using some of its own directly hired

work force to complete the Project.   When issues started to develop, such as which type of union

labor  agreement Mortenson would have to sign and whether it would be feasible for some other

division of Mortenson to sign an agreement which could exclude the division that did work for

Micron Technology, then Mortenson's position started to shift.  Mortenson's position was that it

interpreted the language in the loan commitment to say that it would only be required to be a

signatory to a union agreement *if* it used its own directly hired work force.  Mortenson then

started putting its bid sheets together under the scenario that all work would be done by union

subcontractors and that it did not have to enter into any labor union agreements as long as

Mortenson did not use any of its own directly hired work force.

The Union Defendants argued that all of these negotiations between Regional Council

and Mortenson about a labor agreement occurred in Washington.  They claim that all of the

faxes, proposals, counter-proposals, and letters regarding an agreement were sent between

Mortenson's Bellevue, Washington office and the Regional Council's SeaTac, Washington

office.  But as earlier noted, there were meetings in Boise between Peterson, Washington

Capital, Mortenson, and representatives of various unions about the project.

---

[2] BTA's claims against Mortenson have been dismissed, but Mortenson's representation that it had signed union agreements was the basis of BTA's breach of contract and promissory estoppel claims against Mortenson. *See First Amended Complaint,* Counts Five and Six.

The loan commitment had an expiration date of December 1, 2001, which was later extended to December 31, 2001, and then to January 31, 2002.  After the loan commitment expired, Mortenson and the union representatives continued their negotiations.  Meetings occurred in March, April, May, June, and July of 2002, which ultimately ended when both parties agreed to disagree, and no union labor agreements were ever signed.

### III.
### Legal Standard/Choice of Law.

The Washington Capital Defendants and Union Defendants assert that two states, Washington and Idaho, have competing interests in the resolution of the claims.  In determining a choice of law issue on a pendent state law claim, the federal court looks to apply the choice of law rules that exist in the forum where it sits.  *See Paracor Fin., Inc. v. G. E. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).  The Idaho Supreme Court has adopted the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS (1971) ("SECOND RESTATEMENT") "most significant contacts" test.  *See: Rungee v. Allied Van Lines, Inc.*, 92 Idaho 718, 449 P.2d 378 (1968); *DeMeyer v. Maxwell*, 103 Idaho 327, 647 P.2d 783 (Ct. App. 1982); and *Grover v. Isom*, 137 Idaho 770, 53 P.3d 821 (2002).

The First Amended Complaint contained five causes of actions, Counts Four and Five are no longer before the Court because they were alleged against Mortenson, who has been dismissed.  Count One alleges breach of contract, Count Two alleges breach of the implied covenant of good faith and fair dealing, and Count Three alleges fraud; all of these counts relate to Washington Capital.  Count Four alleges tortious interference by the Union Defendants with BTA's loan commitment with Washington Capital and with BTA's construction contract with Mortenson.  In Count Four, BTA alleges that the Unions pressured Washington Mutual not to

follow through with its loan commitment to BTA.  As to Mortenson, BTA alleges that the Unions improperly tried to force Mortenson to enter into labor agreements when Mortenson was not required to do so because it was not going to have any of its directly hired work force on the Project.  As to each of these counts, BTA reserved the right to seek an amendment to include a claim for punitive damages.

The Court will address the contract, tort and punitive damages choice of law factors and policies  separately because there are some different choice of law nuances as to each of above claims.

**A.     Contract.**

By applying various factors set forth in the SECOND RESTATEMENT, a court can determine which state has the most significant relationship to a contract dispute and find that state also has the greatest interest in applying its law to the issue.  In § 188 of the SECOND RESTATEMENT, the factors to examine in connection with a contract claim include: 1) the domicile, residence, nationality, place of incorporation, and place of business of the parties. 2) the place of negotiations of the contract, 3) the place of contracting, 4) the place of performance, and 5) the location of the subject matter of the contract.

**1.     Domicile, place of business, residence and place of incorporation.**

Looking first at the Plaintiff's side of the case, BTA is a Washington LLC.  Rick Peterson maintained an office in Washington where several conferences occurred during the period of the contract negotiations.  BTA did maintain a Boise office and Peterson also had a Boise residence and reportedly paid Idaho state income taxes for the years 1999-2004.  This factor, if one only looks at BTA, might tip slightly in favor of Idaho, if one were to assume that

**Memorandum Decision and Order  - Page 12**

Peterson's primary residence was in Idaho and BTA's primary office was in Boise, as opposed to where the LLC was formed.   However, the Defendants assert that Rick Peterson also maintains a residence in Bellevue, Washington.  While it is unclear from the record where Peterson maintains his primary residence,  the fact he pays taxes in Idaho would seem to favor Idaho over Washington.

However, when all the other parties to this litigation are factored into the equation, the scales tip to Washington.  BTA's loan broker, Russ Cree, who handled most of the material negotiations worked in Washington for a mortgage brokerage firm that was located in Bellevue, Washington.  Washington Capital Management, Inc., is a Washington corporation with its principal place of business in Seattle, Washington.  The trust that was to loan the money is a Washington trust.  The two key players for Washington Capital/Compass, E. L. Janhcke and Rich Hardan, are Washington residents and worked out of their respective offices in Seattle and Spokane, Washington.

The Pacific Northwest Regional Council of Carpenters principal place of business is in Kent, Washington.  Its primary representatives worked in the union offices in Washington.  Local 635 is an affiliate of the Regional Council and represents carpenters union workers in Boise, Idaho, however, the local chapter did not play a significant role in negotiating the union labor agreements with Mortenson.

Defendant M.A. Mortenson, a Minnesota corporation, managed this job out of its Bellevue, Washington, office.  Mortenson's primary representative during all major negotiations was John Nowoj, located in Bellevue, Washington.  Mortenson did have a construction office in Boise which was staffed by the on-site construction manager who was responsible for day-to-day

activities, however, all major decisions, particularly about union labor agreements for the project were by Nowoj or his superiors.

Looking at all of entities and the parties involved in this dispute, and the degree of their involvement during the negotiations, the scales tip in favor of Washington.

2.      **Place of negotiations.**

This factor probably is not as clear cut as it was 40 years ago, before modern telecommunications.   In the past parties generally had to physically travel to a location to proceed with contract negotiations.  Today, much is handled by email, fax, telephone conferences, and correspondence, and the parties may never meet face-to-face.   In this case, there was a combination of personal meetings and emails, faxes, telephone conferences and correspondence.

The record contains several references of documents being faxed to Peterson's Bellevue and Boise offices.  Cree, who was BTA's loan broker, had several personal contacts with Washington Capital at their offices in Seattle.

Previously the Court has reviewed where some of the physical meetings between the parties occurred.  It is true that there were preconstruction meetings in Boise involving Washington Capital representatives, Mortenson, BTA, and the unions.  There is a dispute between Peterson and Jahncke as to whether their were any discussions regarding the terms of the loan commitment when Jahncke traveled to Boise on 4 or 5 occasions.  Jahncke states that there were none, while Peterson claims terms were discussed.

Even accepting Peterson's version of what was discussed during Jahncke's visits to Idaho, the Court finds that primary site of a vast majority of the negotiations occurred in

Washington, including the final and critical days which led up to the signing of the loan commitment.

The negotiations between  September 26 through October 10, 2001, are especially significant because this is  when the hard bargaining occurred between Peterson and Washington Capital.  Each side was trying to solidify their positions.  Peterson's seven clarifications were rejected and, for a brief time, the deal was off the table.  However, on October 10 the deal came back together.  The place of these important negotiations occurred in Washington.

The place of negotiations is an important fact because the "place where the parties negotiate and agree on the terms of their contract is a significant contact.  Such a state has an obvious interest in the conduct of the negotiations and in the agreement reached."  §188 cmt. 2(e) SECOND RESTATEMENT.  In this case, while some discussion may have occurred on occasion in Idaho, Washington was the focal point of the parties negotiations.

**3.      Place of contracting.**

This factor also favors Washington as having the most significant relationship.  The final act to the formation of a contractual relationship between BTA and Washington Capital occurred in Jahnke's office in Seattle,  when Cree hand-delivered the commitment letter signed by Peterson and the deposit check drawn on BTA's Washington bank account.

Standing alone, the place of contracting is a relatively insignificant contact.  However, it is a factor to be considered.  As used in the SECOND RESTATEMENT, the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect.  *See* §188 cmt. 2(e).

**Memorandum Decision and Order  - Page 15**

4.      **Place of performance.**

This factor focuses on where the commitment letter was to be performed.  The tentative

agreement between the parties was that when everything else was in place, Washington Capital

would disburse money from its banking accounts in Washington to BTA to be used to build the

building.  The failure that BTA complains of is that Washington Capital never followed through

on their agreement to provide the financing for the Project.  The first act in performing this

contract would be the distribution of the funds, and this act would have occurred in Washington

and therefore this would be the place of performance.

5.      **Location of the subject matter of the contract.**

BTA argues that the situs of the subject matter of the contract was the Boise Tower

building in Boise.   The Defendants argue that, while the subject matter of the contract between

BTA and Mortenson was the construction of a building in Boise, this was not the subject of the

contract between BTA and Washington Capital, but instead the loan commitment letter itself

was.

Each side cites to district court decisions in support of their positions.  BTA relies on

*Philips Credit Corp. v. Regent Health Group,* 953 F.Supp. 482 (S.D.N.Y. 1997).  In *Philips*

*Credit,* the unexecuted loan agreements had New York as the choice of law and the court held

that, "Regarding the location of the subject matter of the contract, the location of the collateral

that secures a contract for the repayment of money typically determines the location of the

subject matter of the contract."  *Id.* at 505.

Washington Capital relies on *GMAC Commercial Mortgage Corp. v. Gleichman,* 84

F.Supp.2d 127 (D.Me. 1999), where the court held that arguments that the loans documents

themselves were the subject matter of the dispute as opposed to the location of the property to be financed were both equally viable.  Therefore, this factor favored neither side.  *Id.* at 134.

Washington Capital has also points to § 189 of the SECOND RESTATEMENT.  The Introductory Note to this Section provides:

> This Title deals with particular kinds of contracts.  These contracts are given special attention because it is considered possible to state with respect to each that, in the absence of an effective choice of law by the parties, a particular contact plays an especially important role in the determination of the state of applicable law.

Section 189 discusses contracts for the transfer of interest in land and generally holds that the law of the state where the land is located has the most significant relationship to the transaction.  This is similar to BTA's argument that the security for this loan was intended to be the land and building in Idaho, not Washington.  But this case does not involve the sale or transfer of title of property in Idaho, but the giving of a security interest in the land, to secure a loan negotiated and entered into in Washington.

Under these circumstances, Comment (b) to § 189 is important.  This comment cautions that the rule set forth in §189 applies to contracts for the transfer by sale or lease of interests in land.  Comment (b) then provides:

> By way of contrast, the rule does not apply to contracts in which one party agrees to lend the other money and the other promises to repay the loan and also to give a mortgage on his land as security. Here the debt is the principal thing in the minds of the parties, and the promise to give the mortgage is accessory to the debt.

While Comment (b) is not cited often, at least one court has recognized that when the dispute is over loan applications and borrowing practices, where the property securing the loan was

physically located was not of particular importance since the claim is based on the validity of the debt. *Nelson v. Nationwide Mortgage Corp.* 659 F.Supp 611, 616 (D.C. Cir. 1987).

Each side makes valid arguments in support of their positions, and noting that authority exists for each of their arguments, the Court finds that this factor favors neither side under the facts of this case.

### 6.     Manifestations of any intent by the parties as to choice of law.

Each side tries to glean some intent exhibited by the parties during the negotiations as to what choice of law they intended to apply.  Washington Capital points to language in the commitment letter signed by Peterson on September 7, 2001, which stated, "Oral agreements or oral commitment to loan money, extend credit, or to forebear from enforcing repayment of a debt are not enforceable under Washington law."  BTA states that the draft of the final loan documents, deed of trust, and promissory note all provided that Idaho law would apply.  BTA only became of aware of these drafts after the case was filed since they were never provided to BTA and obviously never signed by either party.  Conflicting interpretations of the intent of the parties can be drawn from these documents,  therefore they favor neither side.

### 7.     Conclusion.

Important policies underlie the rules of choice of law are set forth in § 6 SECOND RESTATEMENT.  While seven broad policies are discussed, two are of particular importance in this case and provide a strong basis why the laws of the state of Washington should be applied.  When looking at the relevant policies of the Washington and Idaho, it is fitting that the state where the contacts are most dominant has an interest in having its laws applied.   Washington has an interest in governing the conduct of those who negotiate and enter into contracts in its

state.  Also, respect must be given to the justified expectations of those who reside in a state as to how to measure their conduct when engaging in business transactions.

Looking at the separate factors, the Court finds that the place of incorporation, domicile, residence; place of negotiations; place of contracting; and  place of performance all favor applying the laws of the state of Washington.  The intent of the parties as to choice of law is not clear from their conduct during negotiations.  Each side has presented valid arguments that the subject matter of the contractual dispute could either implicate the interests of either Idaho or Washington, therefore, this factor does not strongly favor one side or the other.  Weighing all of these factors, the Court will apply Washington law to the contract dispute.

**B.      Tort.**

The Court has already noted that Idaho applies the "most significant relationship test" to choice of law as to contract claim, and the same holds true for tort claims under § 145 of the SECOND RESTATEMENT.  *See Grover v. Isomer,* 137 Idaho 770, 772-773, 53 P.3d 821 (2002).  However, the factors to be consider in determining the most significant contacts in a tort context are somewhat different.  The following factors are considered: 1) the domicile, residence, place of incorporation and place of business of the parties; 2) the place where the relationship between the parties is centered; 3) the place where the conduct causing the injury occurred; and 4) the place where the injury occurred.

**1.      Domicile, place of incorporation, and place of business.**

The Court has discussed these factors at length under the choice of law analysis for the contract claim.  That discussion applies here, and favors the application of Washington law.

**2.      Place where the relationship between the parties is centered.**

**Memorandum Decision and Order  - Page 19**

The Court's prior analysis of where the most significant negotiations occurred between the parties mirrors this factor. Intentional interference with a contract is a business tort, and as one court has noted, is a conduct-regulating tort. *Hidden Brook Air, Inc. v. Thebe Aviation Int'l, Inc.,* 241 F.Supp.2d 246, 277 (S.D.N.Y. 2002). As § 145 SECOND RESTATEMENT explains, "In [cases of interference with contractual relations] the place of business is the more important contact. At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter place."

Turning now to the Union Defendants, admittedly there were meetings in Idaho between BTA, Mortenson, Washington Capital, and union representatives. However, the vast bulk of the interaction between the Union Defendants and the two contractual relationships that BTA alleges the Unions interfered with occurred in Washington.

BTA argues in the complaint that the Union Defendants, "tortiously interfered with the known contractual relationship between BTA and Lender by imposing additional terms and conditions to the Commitment and pressuring Lender to not advance the Loan pursuant to the terms of the Commitment." First Amended Complaint at ¶ 56. The only individual that could have been pressured on behalf of the Washington Capital was Janhcke whose office was in Seattle. The ones applying the pressure were the representatives of Regional Council, also located in Seattle and Spokane. BTA does not set forth any specific meeting or other affirmative conduct on behalf of the Unions, in Idaho, against Washington Capital. In fact, the record actually reflects that from the very beginning, rather than being a passive lender on the sidelines, Washington Capital knew and affirmatively advised both BTA and Mortenson that a condition of

the loan was that all work was to be performed by union labor. This condition was set forth in detail by Washington capital in the loan commitment. Therefore, it is hard for the Court to understand the "pressure" that BTA claims the Union Defendants were "improperly" imposing on Washington Capital.

BTA also alleges, in Count Four, that Washington Capital and the Union Defendants, "intentionally and tortiously interfered with the known contractual relationship between BTA and Mortenson by requiring Mortenson to agree to union labor agreements notwithstanding the absence of a directly hired work force employed by Mortenson and contrary to the terms of the Mortenson Construction Contract." First Amended Complaint at ¶ 55. The vast majority of this alleged conduct occurred in Washington, where Jahncke and Nowoj resided and worked.

The Court earlier recited many of the contacts that occurred between these parties in Washington. Just one more will be highlighted: On March 6, 2002, from his Bellevue Office, Nowoj forward a copy of the Unions' Southern Idaho Master Agreement to Paul Campbell, at Mortenson's headquarters in Minnesota. Nowoj stated in his cover sheet that he was being pressured by the Unions to sign the agreement. Although this occurred *after* the loan commitment expired, it is clear to the Court that the "pressuring" was occurring in Washington, not Idaho.

It seems equally clear to the Court that the state of Washington would have the greatest interest in having its laws applied to what is always considered a very serious claim of contractual interference with a contract, involving alleged improper activities by unions located in its state, against a contractor and lender who are also located in its state.   The fact that the

building would eventually be built in Idaho or Texas takes on little import when considered in that context.

### 3.      Place where conduct causing injury occurred.

In this case, the factors to be considered when examining the place where the parties' relationship was centered and where the conduct causing the injury occurred, mirror one another. As stated in § 145(2) cmt. (f) of the SECOND RESTATEMENT:

> [I]n the case of ....unfair competition claim...the principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise from ....[unfair competition claims].

Because the interest a state has in deterring such conduct, such as intentional interference of contract, that state has the greatest interest in having its laws applied.

After examining all of the factors, the Court finds this important factor favors applying Washington law.

### 4.      Place where injury occurred.

As in the contract analysis, there are persuasive arguments by each party.  BTA argues that the injury was that the fact the loan was never made and therefore the building was never constructed.  Further, BTA asserts that Idaho residents lost their opportunity to purchase condominiums in the Boise Towers, that Idaho construction employees lost employment and income opportunities, and the Boise economy was affected as a whole.  As a result of loan not being funded, BTA states that the CCDC started foreclosure proceedings and several lawsuits were filed in state court against BTA.

Washington Capital argues that the place where the alleged injury occurred was in Washington because that is where the decision was made not to fund the loan.  The Union Defendants argue that because BTA is a Washington LLC, economic losses are more critically felt in the state of incorporation and where it does business.  The Unions also point to the fact that Peterson is a Washington resident, but as noted earlier, Peterson and BTA also maintained a place of business and a residence, respectively, in Idaho.

As to this factor, the Court finds that Washington or Idaho could be considered the place of injury.  Therefore, neither states' interest outweighs the other as to this factor.

**5.      Conclusion.**

The Court finds that the state of Washington has the greatest interest in having its laws applied under Plaintiff's tort of intentional interference of contract by Washington Capital and the Union Defendants.  The critical factors are where the parties relationship was centered and where the conduct causing the injury occurred.  These factors clearly implicate the interest of the state of Washington.

**C.      Punitive Damages.**

In Idaho, a complaint may be amended to assert in the prayer for relief a claim for punitive damages if certain conditions are met.  Idaho Code § 6-1604(2).   A prayer for punitive damages is not a stand-alone cause of action, but flows from an underlying cause of action, such as a breach of contract or a tort,  when the conduct of a party meets the threshold level of being oppressive and outrageous.  Not all states embrace the concept of punitive damages as a method to punish the conduct of a wrongdoer.  In this case, there is a clear conflict because the law in

Washington generally prohibits punitive damages, while Idaho law recognizes punitive damages for several underlying causes of action.

Some cases suggest that a punitive damage claim is to be analyzed and resolved separately under its own choice of law analysis separate and apart from a choice of law analysis as to other claims in the complaint.  Hypothetically, since in this case the Court found that Washington law applies to any claim regarding breach of contract and the covenant of good faith and fair dealing,  the jury could be separately instructed that they impose punitive damages (under Idaho law) if they found the defendant breached the contract and engaged in oppressive and wanton conduct.  *See, e.g. James v. Powell,* 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741, 746-47 (1967)  (Puerto Rico law applies to compensatory damages, the law of New York applies to punitive damages).

One court has framed the analysis as follows:

> In the instant case, the issue is punitive damages.  States' interests in compensatory damages differ from those involved in punitive damages.  When the primary purpose of the rule of law is to deter or punish conduct, the States with the most significant interests are those in which the conduct occurred and in which the principal place of business and place of incorporation of the defendant are located.  The State of the domicile of plaintiff has no interest in imposing punitive damages.

*Keene Corp. v. Insurance Company of North America,* 597 F.Supp. 934, 938 (1984).

Under this analysis, it is not critical if BTA is ultimately correct that its principal place of business and primary residence are in Idaho as opposed to Washington since the focus under punitive damages is where the defendants are located.  As has been repeatedly stated, Washington Capital is a Washington corporation with it principal place of business in

Washington, as are the Union Defendants.  All of the relevant conduct involving the negotiations of the commitment letter and the center of their relationships was in Washington.  The offer and acceptance of the commitment letter occurred in Washington.  Also BTA's claim of intentional interference of contract, as the result of Union "pressure" on Mortenson and Washington Capital, also occurred in Washington.

The Idaho Supreme Court's decision in *Grover v. Isom,* 137 Idaho 770, 53 P.3d 821 (2002), is also instructive in this area.  The case involved a medical malpractice claim and both the doctor and the plaintiff/patient resided in Idaho.  However, the doctor's office and place where the surgery was performed was in Oregon.  Under the facts of this case, punitive damages would not be recoverable against the doctor under Oregon law, but under Idaho law, the plaintiff could seek to amend her complaint to seek such damages.

The Idaho Supreme Court applied the SECOND RESTATEMENT § 145 analysis and found Oregon substantive law applied because the doctor's office was in Oregon, that is where the alleged negligence occurred, and the parties relationship was centered there.  The Idaho Supreme Court looked at the SECOND RESTATEMENT § 6 factors and found they supported applying Oregon law, which would not allow for punitive damages:

> In considering relevant policies of other states it is clear that Oregon has an interest in making certain that oral surgeons practicing in Oregon are subject to Oregon laws and the Oregon standard of care.  The defendants would justifiably expect to be governed by Oregon law, since they were licensed in Oregon and in this case conducted their business in Oregon. 'The basic policy of negligence law is to allow a person to recover from injury proximately caused by another's violation of a duty of reasonable care.'  As a general rule, a victim should recover under the system in place where the injury occurred.  Predictability and ease in determining and applying law are also better served by applying Oregon law, because it is a simple policy that the place of injury should generally govern the choice of law.

**Memorandum Decision and Order  - Page 25**

*Id.* at 773 (citations omitted).

The same factors discussed in *Grover* favor applying Washington law.  The state of Washington has an interest in making sure its lenders and unions doing business in its state conform to certain standards.  Likewise, fund managers and unions need some predictability in measuring their conduct that occurs in Washington **.**

## IV.
## Motion to amend to add claim for punitive damages.

The Court will address this motion first because it presents the clearest conflict between the laws of the states of Washington and Idaho.  Under the laws of the Washington, punitive damages are contrary to public policy.  *Dempere v. Nelson,* 76 Wash. App. 403, 886 P.2d 219 (1994); and *Dailey v. N. Coast Life Ins. Co.,* 129 Wash. 2d 572, 574,  919 P.2d 589, 590 (1996). As the Washington Supreme Court noted in *Dailey,*

> Since its earliest decisions this Court has consistently disapproved punitive damages as contrary to public policy.  Punitive damages not only impose on the defendant a penalty generally reserved for criminal sanctions, but also award the plaintiff with a windfall beyond full compensation.

*Dail*ey at 919 P.2d 590 (citations omitted) .

As discussed under the choice of law section on punitive damages, Washington would have the greatest interest in having it laws applied to the allegations in the First Amended Complaint as opposed to the laws of Idaho.  This is because that is where the center of the relationship was between the parties and where the conduct occurred.

Allowing the Plaintiff to amend the complaint to add such a claim for additional damages would be futile if Washington has the greatest interest in having its laws applied.  In addition, allowing Idaho to regulate conduct against Washington residents that occurred outside of Idaho

through the award of punitive damages would be contrary to law.  *See White v. Ford Motor Co.* 312 F.2d 998 (9th Cir. 2002); and *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559 (1996).

In the alternative,  Washington Capital has argued that, even if Idaho law applied, this case would not warrant granting leave to amend.  The Court agrees.

The facts at trial which must be proven in order to award punitive damages are set forth in section 6-1604(1), which provides:

> In any action seeking recovery of punitive damages, the claimant must prove, by a preponderance of the evidence, oppressive, fraudulent, wanton, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted.

Regarding the requirements for an award of punitive damages, the Supreme Court of Idaho has explained:

> An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was 'an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences.'

*Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 851, 606 P.2d 944, 955 (1980).  As a matter of substantive law, it is well established in Idaho that punitive damages are not favored and should be awarded only in the most unusual and compelling circumstances, and are to be awarded cautiously and within narrow limits.  *Jones v. Panhandle Distributors, Inc.*, 117 Idaho 750, 792 P.2d 315 (1990); *Soria v. Sierra Pac. Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706 (1986); *Cheney v. Palos Verdes Inv. Corp., supra*; *Linscott v. Rainier National Life Ins. Co.*, 100 Idaho 854, 606 P.2d 958 (1980); and  *Hatfield v. Max Rouse & Sons Northwest, supra.  See also O'Neil v. Vasseur*, 118 Idaho 257, 796 P.2d 134 (Ct. App. 1990).

Under Idaho law, the facts here do not support finding that BTA should be allowed to amend its complaint to allege a claim for punitive damages for at least four reasons.  First, the language in the loan commitment always contained the requirement regarding union participation.  Second, the record does not support BTA's claim that Mortenson was always going to rely entirely on union subcontractors and not use any of its own directly hired work force,  as evidenced by the first bid sheet.  Just when Mortenson finally decided not to rely on any of its directly hired work force occurred much later in the process and Washington Capital asserts they were never advised of this by BTA or Mortenson. Third, there is no evidence in the record to support BTA's claim that Mortenson was being forced to enter into a "signatory" or "9(a)" labor agreement by Washington Capital.  Fourth, there is evidence in the record that shows that BTA was pursuing alternative financing with Opus in the Fall of 2001, at the same time it was pursuing the Washington Capital's financing, because having Opus finance the project would do away with the union labor  "premium" that BTA would have to pay, therefore increasing BTA's equity in the project.  There is also evidence in the record that shows that Peterson told Mortenson not to sign any agreements with any of the unions involved  because of the prospect of going with Opus.

The Unions have asserted an additional argument as to why BTA should not be allowed to amend its complaint to assert a claim for punitive damages, one of preemption under federal labor law.  BTA's primary assertion against the Defendant Unions is that the Unions were unlawfully trying to "force" Mortenson to enter into either a § 8(f) or a § 9(a) labor contract even though Mortenson  was allegedly not required to do so under the terms of the Loan Commitment. A "§ 8(f)" labor contract is derived from 29 U.S.C. § 158(f) and a "§ 9(a)" labor contract is derived from 29 U.S.C. § 159(a) of the Labor Management Relations Act ("LMRA").  BTA has

not pled a violation of the LMRA, however, the facts as alleged by BTA against the Unions all relate to what BTA characterizes as improper union organizational pressures against Mortenson so that not only for this project, but also in the future, they would have to be a union contractor in  Southern Idaho.

However, if federal labor law applies to this claim, then preemption becomes a factor because federal labor law was intended by Congress to be controlling on matters regarding unions and union officials based upon union activity.  *Williams v. Pacific Maritime Association*, 421 F.2d 1287, 1289 (9th Cir. 1970).  As such, the LMRA can preempt a state law claim for punitive damages if the claims fairly arise under the LMRA.  Whether the LMRA applies to the claim that the Unions tortiously interfered with its contracts is not presently before the Court and will not be decided in the context of a motion to amend to assert a claim for punitive damages.  However, if it does applies, then the above prohibition against punitive damages would also seem to apply.

In any event, the Court does not find that BTA has established a reasonable likelihood of proving facts at the trial which would support an amendment of the First Amended Complaint, based on BTA's assertion that the conduct of the Union Defendants to rose to the level of outrageous or oppressive conduct or an extreme deviation from reasonable conduct.

### V.
### Plaintiff's motion for partial summary judgment.

If this had been the only motion before the Court, then a lengthy analysis of choice of law based on a conflict between the laws of the Idaho and Washington probably would not have been necessary, because the Court does not find a true "conflict" between the two states on matters of contract interpretation.

In Idaho, in construing a contract the objective is to ascertain and give effect to the intent of the parties. *Bilow v. Preco, Inc.,* 132 Idaho 23,  966 P.2d 23, 27 (1998).  If the contract is clear and unambiguous, the court gives effect to the language employed according to its ordinary meaning.  In construing unambiguous terms of the contract, the court ascertains the parties' intent from the language contained in the contract.  If the contract language is plain and unambiguous, the intention of the parties must be determined from the contract itself, and not from parol or extrinsic evidence.  Unless a contract is ambiguous, it is improper for the Court to consider extrinsic evidence.  *Bilow,* 966 P.2d at 27-28.

In Washington, the courts follow the objective manifestation theory of contracts.  *Hearst Communs., Inc. v. Seattle Times Co.,* 154 Wash.2d 493, 115 P.3d 262 (2005).  Under this approach, a court attempts to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties. The court is to focus on the actual words used and give them their ordinary, usual, and popular meaning unless the content of the agreement clearly demonstrates a contrary intent.  The court is not to interpret what was intended to be written, but what was written. (Citations omitted)  *Id.,* 154 Wash.2d at 502.

Other than a few semantical differences,  the approach to contract interpretation in Washington, as compared to Idaho, is much the same.  But, pursuant to its analysis under the SECOND RESTATEMENT choice of law considerations concerning contracts, the Court will apply Washington law.

The Court finds that the wording at issue is not ambiguous.  Where the contract terms are unambiguous, the Court may construe the contract as a matter of law.  *San Diego Gas and Electric Co. v. Canadian Hunter Marketing, Ltd.,* 132 F.3d 1303 (9th Cir. 1997); and *Brobeck,*

*Phleger and Harrison v. Telex Corp.,* 602 F.2d 866 (9th Cir. 1979).  In doing so, the Court will examine the actual words used and give them their ordinary meaning.

BTA argues that the loan commitment gave Mortenson two options.  First, if Mortenson was going to use any of its directly hired work force, then Mortenson had to be a signatory to a union agreement.  In fact, on one of the bid sheets Mortenson indicated that it was going to use some of its directly hired work force to do rough carpentry.  The other option, and this is the one that BTA asserts Mortenson allegedly finally decided on, was to have Mortenson serve as the supervisory general contractor, and have all labor for the project performed by subcontractors that were signatories to union labor agreements.  Under BTA's interpretation of the loan commitment and under the latter scenario, then Mortenson itself would not have to sign a union labor agreement as a supervising general contractor.  Washington Capital's position, however, is that all through the negotiations they made it clear that Mortenson would have to sign a union agreement, even if did not use any of its directly hired work force.

In deciding which interpretation of the language of the contract is correct, each term of a contract much be given effect.  *Diamond B Contractors, Inc. V. Granite Falls School Dist.* 117 Wash. App. 157, 165, 70 P.3d 966 (2003).

Both parties reference the first paragraph of the loan participation provision which states, "As a condition of closing the loan, *all work to be  performed at the site of construction* shall be performed by *AFL-CIO building trades union labor.*"  (Emphasis added).  This sentence provides that all work or labor at the site would have to be performed by union members.  It does not says that a general contractor as a manager of union subcontractors would have to also be "union."  It applies to "work. . .at the site of construction. . .performed by union members."  As pointed out by BTA, supervisory personnel, who may oversee the work of laborers, are not

**Memorandum Decision and Order  - Page 31**

themselves "building trades union labor."  *See* 29 U.S.C. § 152(3) (expressly excluding

"supervisors" from statutory definition of "employee").

The Court has already addressed the second paragraph of the union participation

provision.  The express language used, given its ordinary meaning, only required Mortenson to

be a party to a trades union agreement if is was going to use any of its directly hired work force.

One other sentence is relevant, for it provides that "The Owner shall require the General

Contractor to award all such contracts or subcontracts to firms which are party to appropriate

AFL-CIO building trades labor union agreement."  This reinforces the intent of the parties that

all subcontractor would have to be signatories to labor union agreements.  It is also a fair reading

of this provision that if *all* the work could be done by union subcontractors, without reliance on

any directly hired work force on the part of Mortenson, then Mortenson would not also be

required to  be a signatory to any labor agreement.

The third paragraph again reinforces the concept that the labor force could all be

subcontractors, because union affiliation would have to be verified by Mortenson.  Also the fund

manager had to be notified of who the subcontractors were, so that union affiliation could be

verified prior to commencement of construction.

To construe the loan commitment as Washington Capital now views it would require that

the contract be rewritten so as to require Mortenson Construction, Inc. to be a member of a labor

agreement, regardless of whether it was going to use any of its own directly hired work force as

labor at the construction site.  It is not the function of the Court to rewrite a contract to give

effect to what one contracting party thought was the intent of the agreement, but to give plain

meaning to the terms the parties agreed to when the contract was signed.

**Memorandum Decision and Order  - Page 32**

In conclusion, the Court finds that BTA's motion for partial summary judgment as to contract interpretation will be granted.  In doing so, the Court is not resolving any liability issues.  There are still several disputed issues of fact whether there was any breach of the loan commitment by Washington Capital.  For example, questions still exist at which point in time Mortenson decided not to use any directly hired work force, assuming they made that decision, and how it would relate to the various deadlines granted by Washington Capital for expiration of the loan commitment.  Also, whether Mortenson's decision not to use a directly hired work force was ever communicated to Washington Capital.  Also questions of fact exist whether Mortenson considered using, for certain phases of the project, a directly hired work force and was therefore exploring different types of union agreements that might be suitable for this project only, but was instructed by BTA not to negotiate with any union while it explored Opus financing.   These issues, along with others, remain outstanding.

\ \ \

\ \ \

\ \ \

## ORDER

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)      Plaintiff Boise Tower's motion to amend complaint to add a claim for punitive damages (docket # 173), filed October 3, 2005, is DENIED.

2)      Plaintiff Boise Tower's motion for partial summary judgment (docket # 184), filed December 13, 2005, is GRANTED.

3)      Plaintiff's oral request at the hearing to be permitted to file a sur-rebuttal brief to the Defendant Unions' sur-reply brief (docket # 224), filed March 27, 2006 (in opposition to an issue raised for the first time in Plaintiff's reply brief in support of its motion for leave to amend), is DENIED.

4)      Defendant Unions' motion for leave to file a supplemental brief in opposition to the motion for leave to add a claim for punitive damages (docket # 230), filed May 5, 2006, is DENIED, and

5)      Defendant Unions' motion to strike (docket # 241) filed June 2, 2006 is MOOT.

DATED:  **June 22, 2006**

_____
Honorable Mikel H. Williams
United States Magistrate Judge