IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| BOISE TOWER ASSOCIATES, LLC, a Washington Limited Liability Company, | ) ) ) ) | CASE NO. CV 03-141-S-MHW |
| Plaintiff, | ) ) | **MEMORANDUM DECISION** |
| v. | ) ) | **and ORDER** |
| WASHINGTON CAPITAL JOINT MASTER TRUST, a Washington trust; WASHINGTON CAPITAL MANAGEMENT, INC., a Washington corporation; PACIFIC NORTHWEST REGIONAL COUNCIL OF CARPENTERS, LOCAL 635; PACIFIC NORTHWEST REGIONAL COUNCIL OF CARPENTERS; and M.A. MORTENSON COMPANY, a Minnesota corporation, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| WASHINGTON CAPITAL JOINT MASTER TRUST and WASHINGTON CAPITAL MANAGEMENT, INC., | ) ) ) ) | |
| Defendants/Counterclaimants, | ) ) | |
| v. | ) ) | |
| BOISE TOWER ASSOCIATES, LLC, | ) ) | |
| Plaintiff/Counterdefendant. | ) ) | |

Currently pending before the Court for its consideration are the following motions:

1) Plaintiff Boise Tower Associates' ("BTA") Second Motion for Partial Summary Judgment (docket # 249), filed July 6, 2006; 2) Washington Capital ("WCM") Defendants' Motion for Summary Judgment (docket # 258), filed July 14, 2006; 3) WCM Defendants' Motion to Strike Plaintiff BTA's Second Motion for Partial Summary Judgment (docket # 264), filed August 11, 2006; 4) Plaintiff BTA's Motion to Amend the Case Management Deadlines (docket # 281), filed September 1, 2006; and 5) WCM Defendants' Motion to Strike the Peterson Affidavit (docket # 289), filed September 22, 2006. After fully considering the matter, the Court will grant WCM's Motion for Summary Judgment and deny BTA's Second Motion for Partial Summary Judgment. The other motions will be addressed in the body of this decision.

## I.
## Procedural Background.

On June 22, 2006, the Court granted BTA's Motion for Partial Summary Judgment, finding on the narrow issue that the October 10, 2001, loan commitment letter, or contract, between WCM and BTA did not require BTA's general contractor, M. A. Mortenson Company ("Mortenson") to enter into labor union agreements unless Mortenson intended to use its directly-hired work force on the project.

Most recently, BTA and the Pacific Northwest Regional Council of Carpenters and Local 635, Pacific Northwest Regional Council of Carpenters ("Union Defendants") reached a settlement of the claims against the Union Defendants that were a part of this suit. BTA previously reached a resolution with Mortenson of its claims against it. Therefore, the only

remaining claims are those that BTA has alleged against the WCM Defendants as follows:  1)

breach of contract, and 2) breach of implied covenant of good faith and fair dealing.[1]

Many of the important facts in this complex case have been discussed in previous orders

and will not be repeated here.   To the extent necessary, the Court will expanded on the factual

background between the parties within the analysis of a particular motion.

## II.
## Standard of Review.

Motions for summary judgment are governed by Fed. R. Civ. P. 56.  Rule 56, which

provides in pertinent part, that judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The United States Supreme Court has made it clear that under Rule 56, summary

judgment is required if the nonmoving party fails to make a showing sufficient to establish the

existence of an element which is essential to his case and upon which he/she will bear the burden

of proof at trial.  *See Celotex Corp. v. Citrate*, 477 U.S. 317, 322 (1986).  If the nonmoving party

fails to make such a showing on any essential element of his case, "there can be 'no genuine

issue as to any material fact,' since a complete failure of proof concerning an essential element

of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323. *See*

*also* Rule 56(e).

---

[1] BTA recently dismissed the Third and Fourth claims of fraud and tortious interference of contract.

**Memorandum Decision and Order  - Page 3**

Under Rule 56 it is clear that an issue, in order to preclude entry of summary judgment, must be both "material" and "genuine."  An issue is "material" if it affects the outcome of the litigation.  An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial," *Hahn v. Sargent*, 523 F.2d 461, 463 (1st Cir. 1975) (quoting *First Nat'l Bank v. Cities Serv. Co., Inc.,* 391 U.S. 253, 289 (1968)), *cert. denied,* 425 U.S. 904, 96 S. Ct. 1495, 47 L.Ed.2d 754 (1976), or when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986).   The Ninth Circuit cases are in accord.  *See British Motor Car Distributors, Ltd. v. San Francisco Automotive Industries Welfare Fund*, 882 F.2d 371 (9th Cir. 1989).

## III.
## WCM and BTA's Motions for Summary Judgment.

### A.    Introduction.

The Court will first address WCM's Motion for Summary Judgment.  As  the Court stated, this motion should be granted, and it logically follows that BTA's Motion for Partial Summary Judgment would be denied.  However, it will be necessary to discuss various issues raised in BTA's motion for Partial Summary Judgment because they are counterpoints to the arguments that WCM advances as to why it should be granted summary judgment.

Before the Court begins its analysis of the parties' motions, it will first address an important issue that plays a pivotal point in the factual and legal analysis that will follow.  This preliminary question relates to whether an agency relationship existed between the loan broker,

Hobart "Russ" Cree, ("Cree") and BTA or whether Cree was acting on behalf of WCM in procuring the loan.

BTA and Peterson assert that Cree was not their agent and during the negotiations between WCM and BTA, Cree was acting on behalf of WCM. For that reason BTA argues that it is not legally bound by any of Cree's actions or agreements with WCM. WCM argues that Cree was the agent of BTA, and that his actions and agreements should be legally binding on BTA.

Prior to Cree becoming involved with this project in 2001, he had been banking and loan brokering field for many years. In 2001, when Cree was first approached about helping to find financing for BTA' Boise Tower project, he was a principal with Glacier Real Estate Finance, located the Bellevue, Washington area. Cree has described Glacier Real Estate Finance as a mortgage banker company. This firm provides a number of different services for lenders and borrowers. On the broker side of this business, Cree would rely on his 11 years of working in the Bellevue area to develop a base of clients, such as borrowers they had worked with in the past and then through networking with those borrowers they would explore what lenders might be able to provide financing for their particular project. Cree also relied on his contacts with several institutional lenders, such as WCM, to help place loans. Cree testified in his deposition that he would often approach different lenders on behalf of a borrower. Cree testified that he would always be working for the borrower and would be paid by the borrower in every case.

One of the lenders that Cree had worked with in the past had been WCM and since approximately 1994, he had closed eight transactions with this lender totaling about $170 million. Cree was personally familiar with El Jahncke who was the underwriter, loan officer and

head of the department at WCM.  With loans placed with WCM, the process was that the

borrower would submit an application along with an application fee.  If the application is

approved, WCM issues a loan commitment letter.  Once the commitment letter was issued and

accepted by the borrower, Cree acts as a facilitator to assist the borrower in getting the loan

closed.  Cree has a financial interest in helping get the loan closed since his fee is paid at the

time of closing.  Cree testified that WCM had a particular interest in construction loan to

borrowers that used union labor in constructing the building since the money WCM was lending

were union pension funds.  In fact using union labor was a requirement of all loans Cree had

made for WCM.

Cree's dealings with BTA and its principal, Frederick "Rick" Peterson, ("Peterson")

commenced in April 2001 when Cree was contacted by another loan officer about assisting with

a construction loan BTA was trying to get from his lender.  This lender would only approve the

loan if another participant could be found for 15 million dollars of the total loan amount to share

some of the risk.  Cree thought of WCM as a potential lender and approached Jahncke to see if

they would have any interest in this construction loan.  Jahncke indicated that they would take a

look at the project as a potential lender.  Cree subsequently was introduced to Peterson by the

other loan officer and he told Peterson that he knew of a lender that might be interested in

participating in the loan.  Cree testified that at the first meeting he told Peterson that the project

would have to be built with union labor if WCM was going to be a participant.  Cree stated in his

experience there was a lot of objections from borrowers about using union labor because of the

perceived extra cost and that he wanted to get this on the table immediately so that there would

be no questions about this requirement further down the road.

Prior to Cree becoming involved in securing the loan, BTA had already agreed to hire Mortenson to be its general contractor and Mortenson had prepared a projection of the costs of constructing the building using non-union labor.  After meeting with Peterson and towards the end of April, Cree had a meeting with the loan officer and John Nowoj, Mortenson's project manager for the Boise project.  The purpose of that meeting was to see if Mortenson would be willing to rebid the project using union labor.   Nowoj made no commitments regarding Mortenson being a signatory to any union agreement and stated that he would discuss with Peterson using union labor for construction.  After issues developed over deferred equity with the other lender, WCM became the only lender interested in project.

Prior to BTA and Cree entering into their fee agreement, Cree sent a letter on June 7, 2001 emphasizing that the project had to be constructed with union labor if WCM was going to provide the financing.  In an email to Jahncke, Cree represented that Peterson was willing to go ahead and rebid the project using union labor.  Cree also attended the meeting on June 19, 2001 in Boise where union representative, Mortenson representatives, and  Peterson discussed the scope of the project and how the project would be important to the unions.

On October 5, 2001 BTA and Cree formalized their "Representation and Brokerage Fee Agreement" where Glacier Real Estate Finance, Inc., agreed to use its best efforts to secure a financing commitment from Washington Capital Management "WCM."   In return, Cree was to receive a brokerage fee of $240,000.

Further into the process Cree worked on behalf of Peterson to keep the equity at a minimum and still have WCM feel comfortable that there was enough money to complete the project.  Cree also marked up a copy of the loan application, advocating Peterson's negotiating

points with WCM to keep the project costs down.  Cree testified that during this entire process

there was never any doubt in his mind that he was acting on behalf of Peterson and acting on his

behalf.  Cree further testified that he always worked for the borrower in these types of

transactions.

On September 26, 2001 WCM issued its commitment letter setting forth the conditions

precedent that BTA would have to comply with to close the loan.  On October 8, 2001 Peterson

responded to WCM with a "conditional" acceptance of the commitment letter.  The next day,

Jahncke replied to Peterson that the changes were not acceptable, and stating that WCM would

be returning the $150,00 application fee.  On or about October 12, Peterson signed the original

commitment letter without his proposed changes.  During October and November Cree remained

available to assist in closing the loan.  During this period of time, Cree testified that issues

continued to be raised about where the equity source would come from.  Cree testified that after

talking with Peterson, he advised WCM that Peterson refused to commit his assets, and instead

wanted to use the sale proceeds from the condominiums, parking stalls and retail space as equity,

but that WCM and Peterson could never reach an agreement that this is where the equity would

come from.

Cree's actions on behalf of BTA and Peterson in assisting in negotiating the loan with

WCM sheds considerable light on the issue of whether Cree was the agent for Peterson and

BTA.  The law on agency is well settled in most jurisdictions, including Washington.  As the

Washington Appellate Court recently stated:

>  An agency relationship may exist, either expressly or by
>  implication, when one party acts at the instance of and, in some
>  material degree, under the direction and control of another. Both
>  the principal and agent must consent to the relationship.  The

> burden of establishing the agency relationship rests upon the party
> asserting its existence.
>
> "Before the sins of an agent can be visited upon his principal, the
> agency must be first established." Under Washington law, an
> agency relationship is created, either expressly or by implication,
> "when one party acts at the instance of and, in some material
> degree, under the direction and control of another." Consent and
> control are the essential elements of the relationship.
>
> An agency relationship does not depend on an express
> understanding, but may arise out of the conduct of the parties. It
> does not exist unless the facts, either expressly or by inference,
> establish that one person is acting at the instance of and in some
> material degree under the direction and control of the other. "It
> arises from manifestations that one party consents that another
> shall act on his behalf and subject to his control, and corresponding
> manifestations of consent by another party to act on behalf of and
> subject to the control of the other." Whether an agency exists
> depends on the peculiar facts and circumstances of each case.

*Stanfield v. Douglas County*, 107 Wash. App. 1, 27 P.3d 205, 215-6 (Wash. App. 2001)(internal citations omitted).

Other general principles are set forth in Restatement (Second) of Agency 7 (1958), for example, an agent has the authority to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.  Manifestation of consent means conduct from which, in light of the circumstances, it is reasonable for another to infer consent.  The manifestation may be made by words or other conduct, including acquiescence.

How these general principles will play out under the facts of this case with be developed later.  At this point it is sufficient to note, that the Court finds that WCM has met its burden of establishing that Cree was the agent of Peterson and BTA.

**B.      Breach of Contract.**

WCM has moved for summary judgment on Count One, BTA's breach of contract claim,

on the grounds that it was excused from performance, i.e. funding the loan pursuant to the loan commitment letter, on the grounds that BTA failed to perform the conditions precedent to the funding.  The conditions precedent were spelled out in writing by WCM  in the commitment letter first issued by WCM on October 10, 2001.  One of the terms of the contract was that the loan must close by December 1, 2001.  WCM later extended the closing date to December 31, 2001, and again to January 31, 2002, at the request of BTA.  In the meantime, before closing could take place, BTA had a number of conditions precedent to satisfy, and WCM argues that the failure of BTA to satisfy even one of those conditions would excuse WCM from further performance under the commitment letter contract.

WCM asserts that BTA failed to satisfy at least four of the conditions precedent agreed to between the parties, before the December 31, 2001 and again before the next extension on January 31, 2002, including the following requirements:  presales with reaffirmation agreements, owner's equity, title insurance , and the union participation.  WCM argues that BTA's failure to satisfy these conditions precedent legally allowed WCM, as the lender, to terminate the loan commitment.

The parties are in agreement as to the general terms of three of the four conditions precedent to the funding of the loan; that being the presales and reaffirmation agreements, owner's  equity, and an acceptable title insurance policy.   However, as to these three, they disagree whether BTA had the ability to fulfilled these conditions, or as will be discussed later, whether BTA was legally excused from complying with these requirements because of the conduct of WCM.

**Memorandum Decision and Order  - Page 10**

The fourth condition precedent, union participation, is different in that the parties disagree as to what exactly this condition required of BTA before the loan would close.  The portion of this condition precedent that both sides apparently agree on is that if WCM was going to fund the loan, the project would have to be built with union labor.   WCM contends that during it negotiations with BTA and after the loan commitment letter was signed, that BTA had not complied with this condition precedent because work was being done on the project with non-union labor, i.e. Newway Construction.   Further, that while BTA had signed the loan commitment letter acknowledging this as a condition precedent, it was secretly telling Mortenson not to sign any union contracts and was entering into negotiations with OPUS Financing for a construction loan where the project could be built without union labor.

The disputed aspect to the union requirement was whether Mortenson, solely in its role as the general contractor, would also have to be a signatory to acceptable union trade agreements, even if it were not going to use any of its directly hired work force on the project.  WCM took the position that Mortenson would also have to sign union trade agreements.  BTA took the position that this was not a part of the fourth condition precedent and as long as Mortenson did not use any of its own directly hired work force, and that all of the construction work was done with acceptable union subcontractors, then Mortenson did not have to sign similar agreements.

This portion of the dispute segues into BTA's next contention  that WCM's  insistence that Mortenson sign labor agreements was an anticipatory breach of the contract by WCM (since the contract did not require this in the first place) and therefore BTA was excused from strictly complying with the other conditions precedent.  As with falling dominos, WCM argues that even if this were case, BTA and Peterson subsequently agreed to a modification of this condition

precedent by agreeing that Mortenson would also have to be a signatory to union trade agreements.   WCM argues that this modification to the contract occurred when Cree, on behalf of BTA and Peterson, negotiated several extensions to the contract closing dates.

The parties do not dispute the general rule in this area, that  performance of the lender is conditioned upon the borrower's obligation to perform conditions precedent.  *See Puget Sound Serv. Corp. v. Bush*, 45 Wash.App. 312, 316, 724 P.2d 1127, 1129 (1986)(where a defendant's obligation is subject to a  condition precedent of performance by the plaintiff, the latter must allege and prove that he performed the condition precedent, or was excused from performance). WCM argues that final performance of the contract to the fund the loan would not be required until all conditions precedent were met.  Restatement (Second) of Contracts § 225, 245 (1979) and 5 Williston on Contracts § 677A (1961).  In his letter of October 26, 2001, Peterson acknowledged that, "WCM retains the right to determine whether the conditions in its commitment letter have been satisfied to justify closing the loan."

1)     **Presale Requirement.**

The first condition precedent required that BTA  have binding written commitments evidencing that BTA had sold 60 condominium units with a minimum net proceeds of $26 million, plus have buyer(s)/tenant(s) for office space at a price of no less that $3.64 million, and have sold at least 94 parking spaces in the aggregate amount of $1.075  million.

By the express terms of the letter of commitment, all of the presales were subject to audit and confirmation by WCM.  During WCM's audit in November of 2001, BTA represented that it had 59 presales, but WCM could not confirm that these sales were under binding contracts.

According to WCM, several "represented" sales were clearly not under binding contracts, and as acknowledged by Peterson in October of 2001, this was WCM's call to make.

The commitments that BTA had from potential purchasers were very dated because of the time that had elapsed from when purchasers had made their initial commitment and when BTA finally was successful in finding a potential lender in WCM.  From WCM's perspective, a far more important part of this condition precedent was the requirement that Peterson obtain and provide "reaffirmation agreements" for all of the 60 of the potential purchasers of the condominiums units, the 94 parking stalls and the retail/office space before the December 31, 2001 and later extended January 31, 2002 closing.  The purpose of the reaffirmation agreements was to provide evidence that the potential purchasers still intended to invest in the project and were willing to renew their prior commitments.

By January 31, 2002, only 37 of the reaffirmation agreements on the 60 condominiums had been returned to BTA and none had been provided to WCM.[2]  As of January 28, 2002, BTA had obtained only 46 parking stall reaffirmation agreement of the 94 required, and none were provided to WCM.  BTA never provided WCM with "satisfactory evidence that the office space was under a Lender approved contract."  BTA never received the down payment or promissory note to make the purchase agreement binding on the potential purchaser.  Finally, no reaffirmation agreement on the retail space was provided to WCM prior to January 31, 2002.

---

[2]       Peterson now claims he was "always" ready to buy two or three of the condominiums himself. Even so, adding three units to the 37 reaffirmation still comes 20 short of the 60 needed.  Also, Peterson never presented to WCM any documentation where he legally obligated himself to buy additional units.

**Memorandum Decision and Order  - Page 13**

2)      **Borrower's Equity.**

The commitment letter further required a certain amount of assets in the form of "borrower's equity" from BTA be invested in the project.  This requirement meant that BTA had to have 5% of the amount of the construction costs in the form of land, cash, letter of credit, or verifiable receipts, or BTA had to have a guarantee from the Mortenson to WCM stating that Mortenson would be responsible for all cost increases over the contract amount.

It was first anticipated that BTA would need to have in excess of $12 million in the form of closing equity.  However, after Mortenson re-bid the contract using union labor and the "union premium" came into play, the equity figure amount increased to $14.8 million.  BTA came up $7.2 million short.  As of January 31, 2002, the issue of having enough borrower's equity still had not been resolved.  Peterson's agent, Cree, after several conversations Peterson, reported to WCM that Peterson refused to put any more of his personal funds as equity in the project and that they would basically have to work it out with the numbers they way they were, or through cost savings.  Peterson also stated he was not willing to refinance any of his other assets.  Cree testified that, "Equity is the king and if the equity's not there, I don't know of any lender that I have ever dealt with or have heard about that would fund a loan without the equity being in place."  Cree Deposition, page 197, line 3-6.[3]

---

[3] BTA takes the position that WCM repudiation and anticipatory breach of the contract occurred in late November or mid-December 2001 when WCM advised BTA that Mortenson would also have to sign union contracts.  This will be addressed in more detail later, but with the one commitment due to expire on December 31, 2001, later extended to January 31, 2002, BTA only had a few week or days to satisfy the equity requirement and Peterson refused to do so out of his funds.

3)      **Clear Title.**

The other conditions precedent that WCM contends had not been satisfied by the

December 31, 2001 and later extended January 31, 2002 closing, involved BTA's failure to clear

two exception that had appeared on the title report.  These exceptions required the negotiation of

an Estoppel Certificate and Amendment to Access Easement between WCM, BTA and the

CCDC.  Negotiations regarding these documents began in late October 2001 and the final

agreements were not reached until late March 2002.

WCM is technically correct that the requirements had not been met as of the January 31,

2002 closing date.  However, the Court finds the estoppel certificate and parking garage

easement were not critical conditions precedent to the closing of the loan in any material sense.

4)      **Union requirement.**

The last condition precedent, generally referred to as the "union requirement" is the most

contentious between the parties.  It is also the most difficult to analyze because it has two facets.

As to the first facet, the parties agree that union labor would have to be used to construct the

building if WCM was going to close the loan.  The second facet is hotly disputed.  WCM's

interpretation of the contract was that  Mortenson, as the general contractor, would also have to

be a signatory to a union contract, even if it did not intend to use any of its directly hired

workforce on the project.  In ruling on the motion for partial summary judgment, the Court found

that the agreement between WCM and BTA did not require that Mortenson also be a signatory to

labor agreements if it did not intend to use any of its directly hired work force.

To satisfy the first facet on the union requirement, it would be BTA's responsibility to

instruct Mortenson that all work done on the project was done with AFL-CIO building trade

unions.  Despite this requirement, Newway Construction, the primary subcontractor doing all of the work on the project, even after the loan commitment was signed by BTA, had never entered into any union agreement.  As an interesting side note, BTA originally sued Mortenson in this same case for violating the agreement between BTA and Mortenson that Mortenson would only award work to union qualified subcontractors and that Mortenson had breached that contract by awarding contracts to non-union subcontractors, such as Newway.

WCM argues that BTA never could have complied with this portion of the union requirement prior to closing because of BTA's own devious conduct.  BTA's owner Peterson directed Mortenson and Newway not to enter into any union agreements.  The undisputed testimony of Nowoj is that, "whether it's Mortenson or Newway or any other subcontractor, it was always directed by Peterson not to actually sign or commit to those [union labor] agreements...."  Daily reports prepared in early February 2002 contained the following instructions from BTA to Mortenson, "to make sure none of subcontractors signed union agreements as required by the contract agreements...so Rick could pursue a new source of financing with [OPUS].  The subcontractor agreements had not been going forth because Peterson had advised Mortenson that he was 80% sure [OPUS] would be funding the project."

On October 17, 2001, a mere week after WCM issued the commitment letter, Peterson approached OPUS, another possible lender for the Boise Tower project, by presenting OPUS with a "book" of information regarding the BTA project.  If Peterson was able to obtain financing through OPUS, which would not require union labor to construct the project, then he would save the union premium.

**Memorandum Decision and Order  - Page 16**

From that point, and clear through to March, 2002, while BTA negotiated with WCM, and unbeknownst to WCM, BTA was also pursuing a deal with OPUS and continued to tell Mortenson to avoid entering into the union contracts for the reason that Peterson was pursuing new financing which would not require union labor.  Peterson acted as if there was no urgency associated with meeting WCM's preconditions because he had an ace in the hole with OPUS. However, Peterson was putting BTA in a risky position in relation to WCM by telling Mortenson not to enter into the union contracts and by not working industriously to meet the preconditions because, in doing so, Peterson was causing his own delay and, therefore, his own anticipatory breach by failing to meet the conditions in a timely manner.  Further, the second extension of the commitment letter expressly stated that "closing must take place by January 31, 2002."

It is not until mid-February, 2002, that Peterson told Mortenson to start bargaining with the unions about contracts.  In early March, 2002, Mortenson began talks in earnest with the Union Defendants, but the talks ended without coming to an agreement because Mortenson realized that it cannot meet the Union's labor contract requirements and still be able to do other construction work in southwestern Idaho with non-union labor, such as projects at Micron Technology in Boise, Idaho.   Of course all of these events were long after the January 31, 2002 loan closing date.

The other aspect of the union requirement relates to Mortenson directly.  BTA's position is that requiring Mortenson to be a signatory to the building trade agreements was an anticipatory breach of the contract by WCM.  WCM argues that it never made a positive and unconditional refusal to close on the BTA loan unless Mortenson agreed to sign appropriate labor contracts so WCM never committed an anticipatory breach.  If there was some pressure

being asserted on Mortenson to sign these agreements, WCM states that it was coming from the Union Defendants.  There is testimony in the record that Mortenson and the Union Defendants were exploring different type of union agreements that could be entered into, also whether the project could be built with another division within Mortenson which would allow continued work for Micron with Mortenson's non-union division.  Peterson testified that WCM told him that the matter had to be resolved between Mortenson and the Union Defendants before the loan could close.

While there may be some merit to WCM's position that there was never a positive statement by WCM that they would never fund the loan until Mortenson signed with the unions, this point is certainly debatable and the Court will assume *arguendo* that their was an anticipatory breach or repudiation of this portion of the union requirement based on WCM's erroneous interpretation of the requirement of the loan commitment.

BTA argues as a matter of law that it never had to tender its performance of all four conditions precedent after this repudiation.  This is partially correct, but there are some additional legal principles that also apply in cases involving anticipatory repudiation.     As noted in a case cited by BTA:

> An anticipatory repudiation, on the other hand, relieves the non-breaching party of the duty to tender performance or to demonstrate to the repudiating party its ability to perform.  In addition to proving the repudiation, the non-breaching party need only show "that he would have been ready and willing to have performed the contract, if the repudiation had not occurred."

*United California Bank v. The Prudential Ins. Co. of America, et al.*, 140 Ariz. 238, 681 P.2d 390, 440-441 (1984)(internal citations omitted).

**Memorandum Decision and Order  - Page 18**

As noted, a party claiming to be damaged by the repudiation must show that he was ready, willing and *able* to perform his obligations under the contract.  The Second Circuit has succinctly summarized the law in this area:

> As part of this damages action for an alleged anticipatory breach, Penthouse bore the burden of establishing its willingness and ability to perform all of the obligations under the agreement. As Professor Corbin has explained,
>
>> [I]n an action for breach by an unconditional repudiation it is still a condition precedent to the plaintiff's right to a judgment for damages that he should have the ability to perform all such conditions. If he could not or would not have performed the substantial equivalent for which the defendant's performance was agreed to be exchanged, he is given no remedy in damages for the defendant's non-performance or repudiation. Of course, the willingness and ability that remains a condition precedent in spite of the defendant's repudiation, is willingness and ability to perform if there had been no repudiation.4 A. Corbin, Corbin on Contracts § 978, ¶. 924-25 (1951).
>
> That the plaintiff must establish its readiness and ability to perform does not mean that it is required to tender performance. After the occurrence of an anticipatory breach, "[i]t is no longer necessary for the plaintiff to perform or tender performance." 4 A. Corbin, Corbin on Contracts § 977, p. 920 (1951) (footnote omitted); This is so because "[t]he defendant's wrongful repudiation justifies the plaintiff in taking him at his word and at once taking steps that may make subsequent performance impossible." 4 A. Corbin, Corbin on Contracts § 978, p. 925 (1951). Nevertheless, the plaintiff must demonstrate that it had the willingness and ability to perform "before the repudiation and that the plaintiff would have rendered the agreed performance if the defendant had not repudiated."

*Penthouse Intern. Ltd., v. Dominion Fed. Sav. & Loan Ass'n.,* 855 F.2d 963, 979 (2nd. Cir. 1988) (internal case citations omitted).

Based on the record before the Court, BTA was not *able* to perform two of the conditions precedent, presales with reaffirmation agreements and owner's equity.  As to the union

**Memorandum Decision and Order - Page 19**

requirement, BTA was not able to satisfy the portion requiring that all subcontractors working on the project had proper union affiliation, in fact the undisputed record is that BTA did not want to comply with this condition precedent because it would then be locked into union subcontractor agreements while it was secretly trying to close the same type of loan with OPUS.

So the extent that WCM did commit some anticipatory repudiation of the portion of the union requirement as it related to Mortenson, it is of no moment.

### 5)    Contract Modification.

As an alternative position, WCM argues that there even if there were an anticipatory repudiation of one portion of the contract, the parties later mutually agreed to include a requirement that Mortenson also sign union agreements.   According to Peterson's testimony, he first became aware that a dispute had developed about whether Mortenson had to sign the labor agreements in November 2001.

In late November 2001, BTA, through its agent Cree, requested a 30-day extension of the commitment letter and WCM agreed to the extension.  On December 7, 2001, WCM sent a reminder letter to BTA to confirm that no further extensions of the commitment term would be given until Mortenson had signed acceptable union labor agreements with the carpenters, cement masons and laborers.  Jahncke testified that he did this because he learned in late November in a conversation with Peterson and Nowoj that they were taking the position that Mortenson did not have to sign such agreements because they were not going to use any of their directly hired work force on the project.  The purpose of the letter from Jahncke's perspective was to address this issue and make it clear that any further extensions would require Mortenson to sign union labor agreements.

**Memorandum Decision and Order  - Page 20**

Peterson has testified that he considered this a "new" requirement over the terms of the loan commitment and that after receiving the December 7 letter, he so advised WCM and Jahncke.  The parties clearly disagreed to what were the obligations of Mortenson at this time, however the question is whether by seeking and agreeing to the subsequent extensions of the loan closing dates from December 31, 2001 and January 31, 2002, did the parties modified the agreement to include that as an express term.  Since the requests were made by Cree on behalf and at the instance of BTA, the extension requests are binding on BTA.

After the request was made on January 2, 2002 to extend the commitment term to January 31, 2002 WCM again reminded BTA that the extension was conditioned on acceptable union agreements with Mortenson.  BTA accepted the extension and acknowledge its acceptance.  In the January 9, 2002 meetings with Mortenson, BTA stated the extension had been granted to the end of January.  After inquiries from CCDC as to the status of the loan, BTA provided a copy of Jahncke's January 2, 2002 letter to CCDC as evidence that the loan was proceeding forward.

Under Washington law, BTA can not later disavow the terms of the extension agreement after having accepted the benefit of the extension.  *Mall Tool Co. V. Far West Equipment Co.,* 45 Wash. 2d 158, 273 P.2d 652, 655 (1954)( a party may not be satisfied with a modification, but if it is not refused, the party will be deemed to have acquiesced.)  Subsequent acts and conduct of the parties to a contract can help to determine their intent.  *Tanner Elec. Co-op v. Puget Sound Power & Light Co.,* 128 Wash. 2d 656, 911 P.2d 1301 (1996).

While BTA may not have been happy with what they perceived was a new term, they accepted two additional extensions of the closing date.  Their subsequent conduct in accepting the extension and advising CCDC that the loan was still going forward also evidenced their

intent to accept the modification, and for that matter, ratify the actions of their agent Cree.  The Court finds that the loan commitment was modified to require that Mortenson also be a signatory to the labor contracts.

> **6)**      **WCM's Failure to Provide Loan Documents.**

Lastly, WCM argues that it did not breach the commitment letter by failing to provide BTA with the loan documents because, even if there were such a duty to provide the documents well in advance of the closing, the failure to provide them was not the ultimate cause of the failure of the loan.

> **7)**      **Conclusion.**

Based on the reasons set forth above, the Court will grant WCM's motion for summary judgment.

## C)      Count II - Breach of the Covenant of Good Faith and Fair Dealing.

The covenant of good faith and fair dealing are implied obligations under every contract in both Washington and Idaho law.  *See Badgett v. Sec. State Bank*, 807 P.2d 356 (Wash. 1991); and *Luzar v. W. Sur. Co.*, 107 Idaho 693, 692 P.2d 337 (1984).  Where there is no merit to a claim for breach of contract, there can be no underlying claim for the breach of the implied covenant of good faith and fair dealing.  *Trimble v. Wash. State Univ.*, 140 Wash.2d 88, 993 P.2d 259 (2000).

The Court has found that WCM did not breach the terms of the loan commitment contract, therefore, BTA's claim for violation of the implied covenant of good faith and fair dealing must also fail as a matter of law.  It is therefore appropriate to enter summary judgment in favor of WCM on this claim.

**Memorandum Decision and Order  - Page 22**

**IV.**
**WCM Defendants' Motion to Strike Peterson Affidavit.**

Pursuant to Fed. R. Civ. P. 56(e), WCM seeks to strike the Supplemental Affidavit of Fredrick Peterson (docket # 275), on the ground that it is "replete with sham testimony, statements based upon a lack of personal knowledge, and hearsay." WCM further asserts that Peterson offers statements in this affidavit which are inconsistent with his prior deposition testimony and was thus obviously fabricated to get past summary judgment.

Fed. R. Civ. P. 56(e) requires that "opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

The "sham affidavit" doctrine prevents the use of manufactured testimony as a means of creating an issue if fact to get past summary judgment:

> [Courts] have held with virtual unanimity that a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity.

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991). In the instance of Peterson's affidavit, WCM argues that it should be wholly stricken because it contains: 1) various conclusory statements which amount to conclusions of law[4]; 2) certain

---

[4]     For example: "The repudiation by WCM of the Loan Commitment had disastrous consequences for BTA." Peterson affidavit at ¶ 60.

**Memorandum Decision and Order  - Page 23**

contradictory statements from prior testimony[5]; and 3) many inadmissible statements based on a lack of personal knowledge because the testimony is based upon "what he understood," or his best "guess," or lack foundation.

Having reviewed the affidavit and the portions of it that are compared to prior sworn testimony, the Court finds that the affidavit does not meet the strict requirement of Fed. R. Civ. P. 56(e).  To the extent that various portions of the affidavit contained conclusions of law, were based on speculation or contradicted Peterson's testimony in his affidavit, they were not considered by the Court.  WCM's motion to strike is therefore granted in part and denied in part.

**V.**
**WCM  Defendants' Motion to Strike**
**Plaintiff BTA's Second Motion for Partial Summary Judgment.**

WCM strongly objects to BTA's filing of a second motion for partial summary judgment on a number of grounds and seeks an order striking the motion.  First, BTA's second motion for partial summary judgment should have been filed at the time that the first motion was filed. Second, BTA's counsel made judicial admissions during the March 13, 2006, hearing on BTA's first motion for partial summary judgment that render the second motion futile.  Third, the motion was filed almost three months after the Plaintiff's summary judgment deadline expired and the motion is untimely.  And finally, the second motion violates the Court's stated preferred policy of only accepting one dispositive motion.

**A.     BTA's motion should have been filed at the time its first motion was filed.**

Although successive motions for summary judgment are not categorically barred, they are generally disfavored in federal court.  *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995),

---

[5]         For example:  "Cree was never authorized by BTA to speak on behalf of BTA on any issue relating to the loan commitment. . ..."  Peterson affidavit at ¶ 20.

**Memorandum Decision and Order  - Page 24**

*cert. denied*, 529 U.S. 1075 (2000); and *Allstate Fin. Corp. v. Zimmerman*, 296 F.2d 797, 799

(5th Cir. 1961)(the federal courts "do not approve in general the piecemeal consideration of

successive motions for summary judgment because parties ought to be held to the requirement

that they present their strongest case for summary judgment when the matter is first raised").

Courts may, however, consider a successive motion for summary judgment in light of certain

circumstances, such as:  "(1) an intervening change in controlling law; (2) the availability of new

evidence or an expanded factual record; and (3) the need to correct a clear error or prevent

manifest injustice."  *See, e.g., Kern-Tulare Water Dist. v. City of Bakersfield*, 634 F.Supp. 656,

665 (E.D. Cal. 1986).

      In this instance, BTA's second motion for partial summary judgment is not based on an

intervening change in controlling law.  The most recent case BTA relies on was decided in 1991.

Nor is BTA's second motion the result of new evidence having become available or an expanded

factual record.  All of the evidence that BTA relies upon in support of the second motion,

including deposition testimony, was available to BTA prior to the time BTA filed its first motion

for partial summary judgment.  The only deposition testimony that BTA did not have at that time

was the testimony of Paul Campbell, which BTA does not rely upon to support its second motion

for partial summary judgment.  Neither has BTA shown that the second motion was necessary in

order to correct "a clear error or prevent manifest injustice."

      However since the Court has granted WCM's motion for summary judgment it has not

been necessary to also consider whether BTA's second partial motion for summary judgment

should be granted.  But the Court would note that its policy of only accepting one dispositive

**Memorandum Decision and Order  - Page 25**

motion, except for good cause shown, is for the main purpose conserving judicial resources so that the Court may attend to its ever-burgeoning docket as economically as possible.

The motion was also untimely by being filed on July 6, 2006, almost three months after the Plaintiff's dispositive motion deadline of April 15, 2006.  The late filing was not accompanied by a motion seeking leave to file the motion late, there has been no showing of good cause for why the motion was filed late, especially in view of all of the information in support having been available at the time the first motion was filed, and there is no evidence of excusable neglect for the motion having been filed late.  However, since the merits of the motion was not taken up by the Court, except in the context of addressing WCM's motion for summary judgment, the motion to strike BTA's Second Motion for Partial Summary Judgment will be denied.

## VI.
### Plaintiff BTA's Motion to Amend the Case Management Deadlines.

Because summary judgment is being granted in favor of the WCM Defendants, this motion is now deemed to be moot.

## <u>ORDER</u>

Based on the foregoing, the Court being otherwise fully advised in the premises, **IT IS HEREBY ORDERED that:**

1)      Plaintiff Boise Tower Associates' ("BTA") second motion for partial summary judgment (docket # 249), filed July 6, 2006, is DENIED.

2)      Washington Capital ("WCM")  Defendants' motion for summary judgment (docket # 258), filed July 14, 2006, is GRANTED.

**Memorandum Decision and Order  - Page 26**

3)      WCM Defendants' motion to strike Plaintiff BTA's second motion for partial summary judgment (docket # 264), filed August 11, 2006, is DENIED.

4)      Plaintiff BTA's motion to amend the case management deadlines (docket # 281), filed September 1, 2006, is deemed to be MOOT.

5)      WCM Defendants' motion to strike the Peterson affidavit (docket # 289), filed September 22, 2006, is GRANTED in part and Denied in part.

DATED: April 2, 2007

Honorable Mikel H. Williams
United States Magistrate Judge